UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DARNELL BROWN,

              Petitioner,               Case No. 1:14-cv-617

v.                                     Honorable Paul L. Maloney

LORI GIDLEY,

              Respondent.

_____/

## **REPORT AND RECOMMENDATION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254. Petitioner Darnell Brown is incarcerated at the Kinross Correctional Facility
in Chippewa County, Michigan. Following a jury trial in the Washtenaw County
Circuit Court, he was convicted of one count each of second-degree murder, MICH.
COMP. LAWS § 750.317, assault with intent to murder (AWIM), MICH. COMP. LAWS §
750.83, assault with a dangerous weapon (felonious assault), MICH. COMP. LAWS
§ 750.82, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, being a felon in
possession of a firearm, MICH. COMP. LAWS § 750.224f, and possession of a firearm
during the course of a felony (felony-firearm), MICH. COMP. LAWS § 750.227b. On
February 29, 2012, the trial court sentenced Petitioner to concurrent prison terms of
thirty to sixty years each for the second-degree murder and AWIM convictions, five
years and four months to eight years for the felonious-assault conviction, six years and

eight months to ten years each for the felon-in-possession and carrying-concealed convictions, and a consecutive term of two years for the felony-firearm conviction.

In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

I. THE TRIAL COURT REVERSIBLY ERRED WHEN IT ENTERED A JUDGMENT OF CONVICTION AND SENTENCE ON THE 2D-DEGREE MURDER AND AWIM CHARGES ON EVIDENCE THAT IS INSUFFICIENT TO SUPPORT THOSE CONVICTIONS.

II. THE PROSECUTOR UNLAWFULLY DEPRIVED MR. BROWN OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN THE PROSECUTOR FAILED TO PROVIDE TRIAL COUNSEL THE CRIMINAL HISTORIES OF CRITICAL PROSECUTION WITNESSES, THERE DEPRIVING THE DEFENDANT HIS RIGHT TO PRESENT A COMPLETE DEFENSE AS REQUIRED BY LAW.

III. THE TRIAL COURT REVERSIBLY ERRED WHEN IT OVERRULED A DEFENSE OBJECTION TO THE FLIGHT INSTRUCTION IT GAVE THE JURY VERDICT FORM THAT PROVIDED THE DEFENDANT COULD BE FOUND GUILTY ON EITHER ASSAULT WITH INTENT TO DO GREAT BODILY HARM LESS THAN MURDER OR ASSAULT ON THE SAME PERSON.

IV. THE TRIAL COURT REVERSIBLY ERRED WHEN IT SCORED 25 POINTS ON OV-3 AND 15 POINTS ON OV-5; AS TO SCORING OF OV-5; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

(Pet. 6-13, ECF No. 1, PageID.10-21.)

Respondent has filed an answer to the petition (ECF No. 7) stating that Petitioner's claims are non-cognizable or without merit.[1]  Upon review and applying

---

[1] In his reply brief (ECF No. 9), Petitioner contends that the Respondent's Answer is deficient and asks this Court to impose sanctions.  (*Id.* at PageID.811-812.)

the AEDPA standards, I find that Petitioner's first three grounds for habeas relief are without merit and his fourth ground for relief is non-cognizable. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

Petitioner's charges stem from the February 26, 2011, killing of Marcus "Pete" Jones and the shooting of Tawaun "Twink" Toliver during a house party in Ypsilanti Township, Michigan. Petitioner received a preliminary examination in Washtenaw County Circuit Court in April, 2011, (ECF No. 8-3.) At the conclusion of the preliminary examination, Judge Christopher Easthope bound Petitioner over for trial on the charges. (Prelim. Examination Tr. 20, ECF No. 8-3, PageID.325.) Petitioner's trial began on January 23, 2012, and it ended on January 25, 2012, with the jury's verdict that found Petitioner guilty on the charges.[2]

Jimika Evans testified that during February 2011 she lived at her house with Marcus Jones and her four children on Nash street in Ypsilanti Township.[3] Marcus

---

Petitioner references Rules 28 and 32 of the Federal Rules of Appellate Procedure. (*Id.*) Those rules, however, are inapplicable at this stage of habeas review. Thus this argument is without merit.

[2] The Court will refer to the transcripts of the trial proceedings as follows:

Trial Transcript for January 23, 2012: (Trial Tr. I ___, ECF No. 8-4, PageID.___)
Trial Transcript for January 24, 2012: (Trial Tr. II ___, ECF No. 8-5, PageID.___)
Trial Transcript for January 25, 2012: (Trial Tr. III ___, ECF No. 8-6, PageID.___)

[3] The trial transcript sometimes refers to the victim and other named individuals by their legal names, and at other times uses their nicknames. For the sake of

was the father of her two youngest children. (Trial Tr. I, ECF No. 8-4, PageID.370.) On February 25, 2011, she was celebrating both Marcus's and her eighteen-year-old daughter's birthdays. To celebrate Marcus's birthday, she went with him to a club in Romulus, Michigan. (*Id.*) They were joined at the club by some of Marcus's friends and family members. (*Id.*) Jimika testified she had also prepared an after party at their Nash street home to celebrate her daughter's birthday. (*Id.* at PageID.371.) Jimika left the club between 1:45 and 2:00 a.m. on the morning of February 26, and she drove back to Nash street separately from Marcus. (*Id.*)

The ride back was uneventful, and Jimika and Marcus proceeded with the house party. (*Id.*) They were in their kitchen, with Jimika's children, preparing plates of food when Tawuan Toliver came into the kitchen and asked Marcus to go with him. The two left through the side door and Jimika saw them whispering to each other. (*Id.*) After they went outside, Jimika heard a series of gunshots. Jimika testified that, at first, she thought the shots were from someone just shooting around outside, and she wasn't alarmed. But the shots continued, and she wondered what was happening. Then Jimika heard her sister, Charlene, scream that Marcus had been shot. (*Id.*) Jimika ran outside and saw Marcus lying on the ground. She told him to get up, but she was unable to get a response from him. (*Id.* at PageID.371-372.) After hearing this testimony, the prosecution asked Jimika if she was familiar with an individual named

consistency, the Court will reference the individuals described in the trial proceedings by their legal names.

"Teddy." She responded that she was, and that she knew his family. She identified Petitioner as Teddy. (*Id.* at PageID.372.)

The prosecution then called Tawaun Toliver to the stand. (Trial Tr. I, ECF No. 8-4, PageID.373.) Tawaun testified that Marcus Jones was a childhood friend. (*Id.*) On the night of February 25, 2011, Tawaun was at the Z-Bar in Romulus to celebrate Marcus's birthday. (*Id.* at PageID.374.) Tawaun was sitting with Marcus and Derrick Andrews (a mutual acquaintance) by the bar when Tawaun saw Petitioner come into the club. Tawaun knew Petitioner because they had grown up in the same neighborhood. (*Id.* at PageID.374-375.) Tawaun testified that when Petitioner walked in, he saw Tawaun and Marcus by the bar and blew a kiss at them. Tawaun testified that this act angered Marcus, and Marcus blew a kiss back towards Petitioner. Tawaun told Marcus, however, that they were there to party and not, presumably, to get into a fight with Petitioner. (*Id.* at PageID.375.) After this initial interaction, Tawaun, Marcus, and the rest of the group stayed at the club for another ten minutes, and then left. Tawaun testified that there were police in the bar's parking lot, and that this was one of the reasons he wanted to leave. (*Id.*)

Tawaun left with his cousin, Kevin, to go to Marcus's house on Nash street. (*Id.*) When they arrived at Marcus's house, they parked the car. Kevin was on the phone, so Tawaun got out of the car and went into the house alone. (*Id.* at PageID.376.) After a few minutes, Tawaun went back outside to get his cousin to bring him in because he knew that Kevin was not familiar with Marcus and would not go into the house by himself. While he was outside to get Kevin, Tawaun saw a van and a Malibu car drive

by. The Malibu parked down the street, and Tawaun then saw Petitioner walk up towards Marcus's house. (*Id.*) Tawaun went back inside the house to tell Marcus that he thought someone was going to try to get inside the house. Tawaun stated that, at first, Marcus thought he was referring to the police, but Tawaun clarified that it was Petitioner who he had seen. Marcus then told Tawaun to follow him outside and walked to the door. When they got to the door, Marcus handed Tawaun his gun and Tawaun put it in his pocket without exchanging any words. (*Id.* at PageID.377.) They went outside, and Petitioner walked up to them. Marcus stopped Petitioner and told him that he wasn't welcome at the house. (*Id.*) Petitioner responded that "if Teddy can't party can't nobody party" and raised a gun, aiming it at Marcus and Tawaun.

Petitioner then shot the gun, and Tawaun turned and ran. (*Id.*) He continued to hear shots, and Tawaun took the gun that Marcus had given him out of his pocket to fire back, but was shot in his back before he could do so. He was able to get a shot off after being shot. (*Id.* at PageID.377, 379.) Tawaun testified he then jumped over a fence, dropping the gun in the process, and ran to the back of the neighboring house. (*Id.* at PageID.377, 379.) There, Tawaun told Kevin by telephone that he had been shot and asked Kevin to pick him up. (*Id.*)

Kevin came to pick Tawaun up and drove him to the hospital. As they pulled into the hospital, Derrick Andrews called Tawaun. He said that Marcus was dead, but Tawaun testified he was hard to understand because he was crying, so Tawaun asked to speak with Shawntae Taylor, who confirmed that Marcus was dead. (*Id.* at

PageID.378.) At the hospital, Tawaun was told he had a broken arm, and subsequently underwent surgery that involved the insertion of a rod. (*Id.* at PageID.380.)

Shawntae Taylor testified that Marcus Jones and Derrick Andrews were childhood friends. (Trial Tr. I, ECF No. 8-4, PageID.388.) On February 25, 2011, he was at the Z-Bar to celebrate Marcus's birthday. (*Id.*) Shawntae left the bar to fetch some money, but was not allowed back in the bar because he had Marcus's ID. (*Id.* at 389.) While he was standing in line trying to get back in, he saw Petitioner. Shawntae testified he knew Petitioner from the neighborhood. They did not exchange words, but Shawntae saw Petitioner enter the bar and blow a kiss towards Marcus and Tawaun. (*Id.* at 390.) Shawntae testified he took that to be a negative action. (*Id.*) Later, Shawntae left the Z-Bar with Marcus and Derrick Andrews. They stopped at a gas station and then went to Marcus's house. (*Id.*) When they arrived, Marcus went inside the house and Shawntae stayed outside with Derrick. (*Id.*) Thereafter, Tawaun arrived, and he asked Shawntae for a cigarette. Tawaun then went into the house to look for Marcus while Shawntae stayed outside in the car. (*Id.* at PageID.391.)

While he was sitting in the car, Shawntae saw a Malibu car drive by, and then later saw Petitioner walking towards the house with a gun held to his side. By that point, Marcus and Tawaun were also outside. Shawntae heard Marcus tell Petitioner, "I don't want to fuck with you" and then heard Petitioner respond that if he could not party, then no one could. (*Id.*) Shawntae then saw Petitioner fire his gun towards Marcus's head and saw Marcus go down. (*Id.* at PageID.392.) He also saw Tawaun turn and run around a truck. (*Id.*) Shawntae also saw Petitioner on the ground.

Then, he saw Petitioner get up, still shooting, and get into a car that then pulled off. (*Id.*) When he heard sirens, Shawntae left with Derrick. Shawntae drove with Derrick to Derrick's house, and from there Shawntae ran to his sister's house. (*Id.*)

Corporal Brian Kittle testified that, on the early morning of February 26, 2011, he was on patrol with his partner when they received an alert of a possible shooting on Nash street. (Trial Tr. I, ECF No. 8-4, PageID.400.) Corporal Kittle testified that when he arrived at the scene, the area was "pretty chaotic." (*Id.*) He estimated there were thirty to forty people in the front yard of the Nash street house, and that there were individuals leaving the area by foot and by vehicle. (*Id.*) Corporal Kittle saw Marcus Jones lying on the ground. Marcus was not moving and did not appear to be breathing. (*Id.*) Corporal Kittle worked to secure the scene so that the medical personnel could attend to Marcus. (*Id.*) Corporal Kittle then testified that, on a later date, he was directed to conduct some interviews of those who had been present at the scene. (*Id.*)

Deputy Joshua Arts testified that he was on duty around 2:35 a.m. on February 26, 2011. Around that time he received an alert from his dispatch that there had been a shooting in the West Willow neighborhood, where the Nash street house was located. (Trial Tr. I, ECF No. 8-4, PageID.401.) When he arrived, Deputy Arts saw several people at the house, and "a lot" of people in the streets and in their cars who were leaving the area. (*Id.* at PageID.402.) There were also approximately thirty to forty people around Marcus Jones, who was lying on the ground. (*Id.* at PageID.402.) The deputy saw some blood on the ground, and Marcus Jones was not

moving and appeared to be unresponsive. (*Id.*) Deputy Arts testified that he worked to move those who were standing around Marcus back, so that ambulance personnel could move in. He also attempted to obtain statements from witnesses, but was largely rebuffed. Once the ambulance had taken Marcus Jones away, the deputy remained to secure the scene for the detective bureau. (*Id.*)

Mariea Evans testified that she was the cousin of Jimika Evans, and knew Marcus Jones since she was little. (Trial Tr. I, ECF No 8-4, PageID.403.) On the evening of February 25, 2011, she was at the Z-Bar with Jimika and Marcus celebrating Marcus's birthday. (*Id.*) At the bar she also saw Petitioner. Mariea testified that she had known Petitioner for a long time. She knew his family, and had children with one of his cousins. (*Id.*) After leaving the bar, Mariea Evans went to Jimika and Marcus's house for a plate of food. After filling a plate, she left to take it out to her car, but her cousin Charlene had moved the car. (*Id.* at PageID.404.) While Mariea was looking for her car, she saw Petitioner and started talking to him. She then saw Petitioner walk up to Marcus, and heard Marcus tell Petitioner he was "not fixing to come in here." (*Id.* at PageID.405.) Marcus had his hands in his pockets. (*Id.* at PageID.406.) She then heard a "click clack" from a gun and "took off" running down the road. She ran until she stopped hearing gunshots. (*Id.* at PageID.405.) When people began crying and yelling she ran back. (*Id.* at PageID.406.) She saw Marcus on the ground and went down to hold his shoulders and to talk to him. (*Id.* at PageID.407.) The prosecutor concluded her questioning of Mariea Evans by asking about Tawaun Toliver. Mariea testified that she knew him, but did not seen him out

there that night.  Later, however, she learned that he had been shot, and also learned that Petitioner had been shot. (*Id.*)

Teshia Wilson testified that she knew Jimika Evans, Marcus Jones, and Derrick Andrews.  Jimika and Marcus were long time family friends, and Derrick was her cousin. (Trial Tr. I, ECF No. 8-4, PageID.410.) On the night of February 25, 2011, she was at the Z-Bar to celebrate Marcus's birthday, but did not actually go inside.  When she left, she went to Jimika's house for the after party.  (*Id.*)  She testified there were a lot of people at the party and music was playing.  (*Id.* at PageID.411.)  She was outside speaking with Derrick Andrews when she saw Marcus Jones come outside.  Then an individual walked up to Marcus, and she heard Marcus tell him that he could not come inside the house.  (*Id.*)  She saw the individual lift his hand up and heard a "pow pow pow." (*Id.*)  She and Derrick ran away, but after the shots stopped she came back and heard Jimika yelling that Marcus was dead.  (*Id.* at PageID.412.)  Teshia called the police.  (*Id.*)

Trooper Kevin Curtis testified that, on February 26, 2011,[4] he was dispatched to a traffic crash at around 2:41 a.m. (Trial Tr. I, ECF No. 8-4, PageID.414.)  When he arrived, he observed a 1999 gray Chevy Malibu.  It appeared that the car had taken an expressway exit at too high a speed and ran through a few signs before coming to a rest in the snow.  (*Id.*)  There were three occupants in the Malibu, one of whom was Petitioner, who was in the backseat and complaining of pain.  (*Id.*)  The trooper was

---

[4] The transcript appears to incorrectly refer to the month as September.

told that Petitioner had been shot. (*Id.*) Thereafter an ambulance arrived to take Petitioner to the hospital. (*Id.* at PageID.415.)

Detective Mark Neumann testified that he received a call from his supervisor at approximately 4:00 a.m. to report to the Nash street residence for a homicide investigation. (Trial Tr. I, ECF No. 8-4, PageID.416.) Shortly after arriving, however, the detective went to the station to interview the witnesses in the case. (*Id.*) There, he interviewed Mariea Evans. He spoke with her about whether she knew Petitioner and whether she had seen him with a gun. (*Id.*)

On March 1, 2011, the detective went to the Nash Street house to meet with several other potential witnesses. (*Id.* at PageID.417.) The detective testified that on the night of Marcus Jones' death, there had been a lot of snow on the ground, but that since that time much of the snow had melted. (*Id.*) As he walked up to the house, the detective noticed a .40 caliber shell casing laying on the ground. (*Id.*) He collected the casing and documented where he had found it. He then turned the casing over to Detective Scafasci, who had processed the scene on February 26. (*Id.* at PageID.418.)

Detective Thomas Sinks testified that, on February 26, 2011, he was dispatched to the Nash street house. When he arrived, he was told to attend Marcus Jones's autopsy. (Trial Tr. I, ECF No. 8-4, PageID.420.) He was tasked with photographing the procedure, and collecting any evidence from the body. (*Id.*) In this case, he recovered bullet fragments, DNA, fingerprints, and hair. (*Id.*)

Dr. Jeffrey Jentzen testified as an expert in the field of forensic pathology. (Trial Tr. II, ECF No. 8-5, PageID.428.) On February 26, 2011, he performed an

autopsy on Marcus Jones.  (*Id.*)  An external examination revealed gunshot wound injuries to Marcus Jones' head, left arm, and abdomen.  (*Id.*)  The bullet that had entered Marcus Jones' head entered into the brain cavity and struck the brain.  It ricocheted around the back of the brain and became lodged in the external ear canal.  (*Id.*) None of the three wounds appeared to have been close range or contact wounds.  The doctor thought that the gun that fired the bullets was at least two to three feet away from Marcus when it was fired.  (*Id.* at PageID.430.)  The doctor also examined pictures of Tawaun Toliver's wound.  He identified a wound on Tawaun's left upper back as an entrance gunshot wound.  He also identified an exit wound from the front view.  (*Id.*)

Dr. Wallace Arneson testified that he treated Tawaun Toliver in the ER on February 26, 2011.  (Trial Tr. II, ECF No. 8-5, PageID.432.)  X-rays revealed a fracture of the humerus bone in the upper left arm.  (*Id.* at PageID.433.)  The X-rays also showed bullet fragments, but those were not removed on that night.  (*Id.*)

Charlene Evans testified that she was the sister of Jimika Evans, and that Tawaun Toliver was her brother-in-law.  (Trial Tr. II, ECF No. 8-5, PageID.434.)  On the evening of February 25, 2011, she went to the Z-Bar to celebrate Marcus Jones' birthday.  (*Id.*)  At the bar, she saw Tawaun and Petitioner interact.  (*Id.* at PageID.435-436.)  Afterwards, she went to Jimika's house.  (*Id.* at PageID.435.)  She went inside to get some food and then left to go take it to her car that was parked across the street.  (*Id.*)  While she was outside, she noticed Petitioner walking up towards the house.  Marcus Jones and Tawaun Toliver were also outside.  She heard

Marcus tell Petitioner he could not come inside the house. While her back was turned to them, she heard gunshots. (*Id.*) When Charlene turned around she saw Tawaun limping away, Marcus on the ground, and Petitioner getting up and limping. (*Id.* at PageID.436.)

Detective John Scafasci testified that he received a call on February 26, 2011, to go to the Nash street house and process the crime scene. (Trial Tr. II, ECF No. 8-5, PageID.440.) He took pictures both inside and outside the house. (*Id.*) The detective testified that at the time there was about six inches of snow on the ground, and that the presence of snow can obstruct evidence collection. (*Id.* at PageID.441.) The detective identified various pictures he had taken at the crime scene of different pieces of evidence including bullet casings. (*Id.*) After he collected the evidence, the detective packaged it, sealed it, and logged it in. (*Id.* at PageID.443.) The detective was also responsible for collecting evidence from the 1999 Chevy Malibu. (*Id.*) He found a black sweatshirt inside the car. (*Id.*)

Detective Everette Robbins testified that she responded to the Nash street house on February 26, 2011, to assist with a report of a homicide. (Trial Tr. II, ECF No. 8-5, PageID.445.) As part of her duties, she interviewed Charlene Evans. (*Id.* at PageID.446.) She testified that Charlene was uncooperative and did not want to become involved with the case. (*Id.*) Charlene was scheduled for a second interview, but was a no-show. (*Id.*)

Detective Sergeant Robert Rayer testified that he examined the microscopic markings from five fired cartridge cases and determined that they had been fired from

the same gun. (Trial Tr. II, ECF No. 8-5, PageID.449.)  They were consistent with being .40 Smith & Wessen caliber bullet casings.  (*Id.* at PageID.450.)

Detective Michael Babycz testified that, on February 26, 2011, he was advised of a homicide in the West Willow neighborhood and responded to the Nash street address.  (Trial Tr. II, ECF No. 8-5, PageID.452.)  When he arrived, there were a number of marked police cars already on the scene, and yellow crime scene tape had been erected.  (*Id.*)  He testified that a neighborhood canvas was performed, which involved going door to door and speaking with the neighbors to see if they had witnessed any portion of the incident or had any knowledge of the event.  (*Id.*)  The detective also identified pieces of evidence that were obtained from the hospital where Petitioner, Tawaun, and Marcus had been taken.  (*Id.*)  He testified he obtained a pair of folded up black jeans, a black head rag, and a black tee shirt that had been taken from Petitioner.  (*Id.* at PageID.453.)  Continuing with his investigation, the detective took pictures of Tawaun Toliver's injuries.  He was also present when Tawaun Toliver, Shawntae Taylor, and Derrick Andrews were interviewed.  He further looked for the gun that Tawaun said he had dropped when he jumped over the fence, but was unable to locate it.  (*Id.* at PageID.455.)

The prosecution then asked Detective Babycz about Derrick Andrews.  As the officer in charge, the detective attempted to have Derrick subpoenaed to testify during Petitioner's trial but, though several attempts were made, he was unsuccessful in subpoenaing Derrick.  (*Id.* at PageID.456.)  The detective was told that Derrick Andrews was intentionally hiding from the investigators.  (*Id.* at PageID.457.)  The

prosecutor noted that the defense had stipulated to allowing Derrick Andrew's testimony from the preliminary investigation to be read into the record at trial. (*Id.*)

At the preliminary examination, Derrick Andrews testified that he was a friend of Marcus Jones. (Trial Tr. II, ECF No. 8-5, PageID.459.) On February 25, 2011, he went to the Z-Bar to celebrate Marcus's birthday. (*Id.*) He saw Petitioner blow a kiss towards Tawaun, and Tawaun blow a kiss back. (*Id.* at PageID.460.) Nothing else happened at the bar, and he left with Marcus and Shawntae to go to Marcus' and Jimika's house. When they arrived, Marcus went inside the house, but Derrick stayed outside with Shawntae. (*Id.* at PageID.461.) After about fifteen or twenty minutes, Derrick walked over to speak with his cousin Teshia. (*Id.*) Teshia then told him that somebody had a gun. Derrick looked up and saw someone dressed in all black with a hood walking towards the house and carrying a gun by their side. (*Id.* at PageID.462.) Though he did not see Marcus, he heard him say "what are you doing, you can't come in here." (*Id.*) Derrick testified he saw the individual dressed in black raise the gun in his left hand and cock the gun. (*Id.*) After that, Derrick heard gunshots. He saw the individual dressed in black down on the ground, continuing to shoot, and then get up and walk back to the car. (*Id.* at PageID.463.) Teshia grabbed Derrick and told him they should leave, and they got in a car. By the time they got out of the driveway, however, the shots had stopped, and Derrick ran to his car and moved it around the corner. He then went back to the Nash street house. (*Id.* at PageID.462.) There, he saw Marcus on the ground and bleeding from the mouth. Derrick described the scene as chaotic, with a lot of screaming. (*Id.*) When the police arrived, he walked back to

his car. On the way he saw Shawntae, who had his phone, and Derrick stopped to retrieve the phone. (*Id*. at PageID.464.) After that, Derrick went home. (*Id*.)

After reading Derrick Andrew's testimony into the record, the prosecution rested. (*Id*. at PageID.468.)

The defense began their presentation by calling Erika McKaye to the stand. (Trial Tr. III, ECF No. 8-6, PageID.480.) Erika testified that she had known Marcus since she was little and had known Petitioner all her life. (*Id*.) On February 25, 2011, she was at the Z-Bar to celebrate Marcus's birthday. (*Id*.) At the bar she saw Marcus Jones, Tawaun Toliver, and Petitioner. She did not see anything occur between those three. (*Id*. at PageID.481.) Erika left the bar with her sister and her sister's friend to go to Marcus's house in the West Willow neighborhood. (*Id*.) She arrived there around 2:30 in the morning, and there were about thirty or more individuals at the house. (*Id*.) She went inside to use the bathroom, and then left. When she left, she saw Marcus Jones and Tawaun Toliver standing outside. (*Id*.) She also saw Petitioner walking towards the house. (*Id*. at PageID.482.) She did not see him carrying a gun, but testified she could not see his hands. (*Id*.) As she walked towards her car, she heard gunshots. She did not see who was doing the shooting. (*Id*.) She then saw Petitioner on the ground, and then get up and limping. (*Id*.)

Shamera McKaye testified that Petitioner was her cousin. (Trial Tr. III, ECF No. 8-6, PageID.483.) On February 25, 2011, she was at the Z-Bar with her sister Erika and some other friends. She saw Petitioner, Marcus Jones, and Tawaun Toliver at the bar. (*Id*.) She did not observe any problem between the three. (*Id*.) She left the

bar with her sister to go to the after party at the Nash street house. (*Id.*) She testified that she found out about the party through word of mouth at the club. (*Id.*) She got out of the car, and went into the house to use the bathroom and get something to eat. But the lines for both were long, and so after about fifteen minutes she decided to leave. (*Id.* at PageID.484.) She left with her sister and went outside. She saw several people standing outside and noticed Petitioner as well and exchanged greetings. (*Id.*) She then spoke with a friend and started to walk to her car. Before she got to her car, Shamera heard gunshots, and she got into her car and slouched down. (*Id.* at PageID.485.) She looked up and saw someone laying on the ground. She also saw Petitioner, who was being helped up, and it looked to her like he had been shot. (*Id.*)

Martez Gardner testified that he saw Petitioner at a house party in the West Willow neighborhood on the night of February 25, 2011. (Trial Tr. III, ECF No. 8-6, PageID.486.) He had also gone to the Z-Bar with Petitioner that night. Martez testified that there was no drama or problems at the bar between Petitioner and anyone else. (*Id.*) He left the bar separately from Petitioner, but received a call from him to go to the house party in West Willow. (*Id.* at PageID.487.) When Martez arrived, Petitioner was still sitting in a car with some others. Martez got out of his van and spoke with his cousin Erika. (*Id.* at PageID.488.) He then saw Petitioner get out and walk towards the Nash street house. Martez testified that he had a good look at Petitioner, and he was not holding a gun. (*Id.*) Petitioner walked up towards three individuals, two of whom were Marcus and Tawaun. (*Id.*) Martez was about three or four steps behind Petitioner. (*Id.*) He heard some words exchanged, and then saw

Tawaun pull out a gun and shoot Petitioner. (*Id.* at PageID.489.) After he had been shot, Petitioner pulled out a gun in his left hand and fired it at Tawaun. (*Id.*) He saw Tawaun take off running and shoot behind him as he ran. (*Id.*) Once the firing stopped, Petitioner fell down, and Martez helped pick him up off the ground. (*Id.*) He drove with Petitioner towards the hospital, but got in a crash as they tried to get off the highway. (*Id.*)

Dangelo Williams testified that he was at a bar with Petitioner during the early morning hours of February 26, 2011. (Trial Tr. III, ECF No.8-6, PageID.496.) When the bar closed he left with Petitioner to go to a house party in the West Willow neighborhood. (*Id.*) They got out of the car and spoke to a few people outside, and then went to go inside the house. (*Id.*) As they walked up, they saw Marcus and Tawaun standing outside. (*Id.*) He then heard Tawaun tell Petitioner he was not welcome, and saw Tawaun pull out a gun and fire it. (*Id.*) Dangelo saw Petitioner go limp and kneel down. Petitioner then pulled a gun out from his pants and fired it. Thereafter, Petitioner turned and tried to limp out of the yard. Dangelo helped Petitioner get up and got into a car with him. (*Id.*)

Petitioner testified that on the afternoon of February 25, 2011, he was at a liquor store and that a woman named "Shimmy," who he knew, informed them she was having a birthday party at a bar that evening (not Z-Bar) and that there was also an after party in the West Willow neighborhood. (Trial Tr. III, ECF No. 8-6, PageID.500.) Petitioner went back to his house from the liquor store, and then performed a few errands. When he returned, Martez Gardner told Petitioner about plans to go to the

Z-Bar.  (*Id.* at PageID.501.)  They went there instead of Shimmy's birthday party, and he saw Shawntae Taylor in line.  He did not speak to Shawntae and went around him to enter the bar.  (*Id.*)  There, he saw Marcus Jones and Tawaun Toliver.  (*Id.*)  While he was speaking to someone at the bar, Marcus, Tawaun, Derrick, and another individual walked up and turned their faces up at him.  (*Id.*)  He testified that they were "mugging" him, in other words, making an angry face at him.  (*Id.* at PageID.504.)  He turned his face up to them as well, but he was encouraged by his friend to ignore them and he did so.  (*Id.*)  A few minutes later, Marcus and the others left the bar.  (*Id.* at PageID.501.)

Later, Petitioner and his friends left the bar intending to go to Shimmy's after party in the West Willow neighborhood. (*Id.* at PageID.502.)  When they arrived at the area, they stopped so that one of the car's passengers could speak with someone he knew.  A van pulled up behind them and honked its horn, so Petitioner went down the street and parked.  (*Id.*)  He got out and joined up with Martez Gardner.  He saw a lot of people outside, and thought that it was the party for Shimmy.  (*Id.*)  Petitioner admitted that when he got out of the car, he had a gun in his pocket.  He testified he carried it with him because lots of things can happen at house parties.  Petitioner testified that even though he had the gun, he did not intend to shoot anyone that night and was not looking for someone to shoot.  (*Id.*)  The group stopped outside and talked to some individuals they knew.  (*Id.* at PageID.502-503.)  Petitioner was getting cold because he wasn't wearing a coat and wanted to go inside.  Martez told him to wait, so Petitioner walked towards the yard with his head down.  (*Id.* at PageID.503.)

As he walked towards the house, Petitioner heard Tawaun Toliver speaking with Marcus Jones. (*Id.*) Petitioner told them he was just there to party. Then Tawaun pulled out a gun and shot Petitioner in his side. Petitioner also saw Marcus pull his hands out of his pockets and Petitioner testified he thought that Marcus was pulling out a gun. (*Id.*) In response, Petitioner pulled out his gun with his right hand and started shooting in the area where Marcus and Tawaun were. (*Id.*) He then remembered being helped up off the ground. Petitioner testified that he did not, at that point, know whether he had shot anyone. (*Id.* at PageID.504.)

After receiving instructions and hearing closing arguments, the jury returned the guilty verdicts. (*Id.* at PageID.533.) The Court accepted the verdicts and further found Petitioner was a habitual offender, third offense. (*Id.* at PageID.534.) Petitioner was sentenced on February 29, 2012. (Sentencing Hr'g, ECF No. 8-7, PageID.537.) After hearing argument, the court sentenced Petitioner on counts one and two to thirty to sixty years' imprisonment, consecutive to count seven, and concurrent to the other counts. (*Id.* at PageID.575-576.)

## B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 7, 2011, raising the four issues raised in the instant habeas petition together with two additional grounds for relief:

> V. THE TRIAL COURT UNLAWFULLY VIOLATED THE UNITED STATES AND MICHIGAN CONSTITUTIONS IN SENTENCING THE DEFENDANT TO A PRISON TERM OF 30-60 YEARS ON A HABITUAL OFFENDER 3d SUPPLEMENT ARISING OUT OF THE 2d-DEGREE MURDER AND AWIM CONVICTIONS, TO A

PRISON TERM OF 64 MONTHS TO EIGHT YEARS ON A HABITUAL OFFENDER 3d SUPPLEMENT ARISING OUT OF THE ADW CONVICTIONS, AND TO PRISON TERMS OF 80-120 MONTHS ON A HABITUAL OFFENDER 3d SUPPLEMENT ARISING OUT OF BOTH THE CCW AND THE POSSESSION OF A FIREARM BY A FELON CONVICTIONS; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

VI. THE TRIAL COURT REVERSIBLY ERRED WHEN IT FAILED TO GRANT HIM THE CORRECT AMOUNT OF JAIL CREDIT ON THE CCW CONVICTION; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

(*See* Def.-Appellant's Br. on Appeal, ECF No. 8-8, PageID.592-593.) Petitioner also filed a Standard 4 brief, dated September 19, 2012, raising two additional claims:

I. DID PROSECUTORIAL MISCONDUCT IN CROSS-EXAMINATION OF THE DEFENDANT AND IN FAILING TO DISCLOSE RELEVANT FACTS - EVIDENCE DEN[Y] MR BROWN HIS DUE PROCESS RIGHT TO A FAIR TRIAL?

II. WAS DEFENSE TRIAL COUNSEL CONSTITUTIONALLY INEFFECTIVE IN VIOLATION OF THE SIXTH AMENDMENT FOR FAILING TO OBJECT TO THE PREJUDICIAL REMARKS MADE BY THE PROSECUTOR DURING THE CROSS-EXAMINATION OF THE DEFENDANT AND FOR FAILING TO OBJECT AND REQUEST TO HAVE THE PROSECUTOR COMPELLED TO DISCLOSE RELEVANT FACTS - EVIDENCE?

(Def.-Appellant's Standard 4 Br., ECF NO. 1-3, PageID.82.) Petitioner also raised a separate, unnumbered claim that the trial court's restitution order should have been waived. (*Id.* at PageID.109.) By unpublished opinion issued on May 28, 2013, the

Michigan Court of Appeals rejected all but one of Petitioner's appellate arguments.[5] (*See* 5/28/13 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 8-8, PageID.580-588.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same claims raised before and rejected by the Michigan Court of Appeals, save for the jail credit claim that was remanded by the court of appeals and the unnumbered restitution claim from his Standard 4 brief. (*See* Def.-Appellant's Pro Per Application for Leave to Appeal, ECF No. 8-9, PageID.776-788.) By order entered October 28, 2013, a majority of the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 10/28/2013 Mich. Ord., ECF 8-9, PageID.775.)

Petitioner did not appeal to the United States Supreme Court, nor did he seek collateral relief. Petitioner filed his habeas petition on June 6, 2014, raising the first four claims presented to the Michigan appellate courts. (ECF No. 1.) This case is ripe for decision.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state

---

[5] The Michigan Court of Appeals remanded on the sixth issue to direct the trial court to amend Petitioner's judgment of sentence to reflect that his felony-firearm sentence was not consecutive to his CCW sentence (MCOA Op. 7, ECF No. 8-8, PageID.586.) This issue is not relevant to any of the grounds for habeas relief raised by Petitioner.

court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent

at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that

the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I. Sufficiency of the Evidence

In his first ground for habeas relief, Petitioner contends that the prosecutor failed to present sufficient evidence to find him guilty of second-degree murder and AWIM.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a

nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Petitioner argues there was insufficient evidence to find him guilty of the crimes because the killing of Marcus Jones was done in self-defense, and there was no ballistics test that matched the bullets used to a gun that he possessed. The Michigan Court of Appeals disagreed, and held that the evidence produced at trial was sufficient to support the jury's verdict finding Petitioner guilty of second-degree murder and AWIM:

> We find the evidence was sufficient for a rational jury to find defendant guilty of second degree murder and AWIM beyond a reasonable doubt. Defendant's argument related to both offenses rests on his contention that the jury should have believed his testimony that he acted in self-defense. A killing done in self-defense is justifiable homicide "if the defendant honestly and reasonably believes that his life is in imminent danger or there is a threat of serious bodily harm." *People v James*, 267 Mich App 675, 677; 705 NW2d 724 (2005) (quotations omitted). Defendant's argument is without merit because there was evidence that after defendant was told he was not welcome at the house party, he replied, "If [I] can't party, can't nobody party" and fired the first shot, thereby contradicting his claim of self-defense. The resolution of this credibility dispute was a matter for the jury to decide. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). We conclude that the evidence was sufficient for the jury to resolve this conflict in favor of the prosecution, and defendant's claim fails.
>
> Defendant also argues that a rational jury could not have found him guilty of murder because ballistics testing never matched the bullets found in Jones's body to a gun he possessed. However, such scientific evidence is not necessary to support a conviction. The evidence is sufficient if it allows for a jury to make reasonable inferences establishing the presence of each element of the crime. See *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). When viewed in a light most favorable to the prosecution, the testimony that defendant shot Jones in

the head was sufficient evidence for a rational jury to find beyond a reasonable doubt that defendant's actions caused Jones's death, in spite of the fact that there was no ballistics evidence in this case.

(MCOA Op., ECF No. 8-8, PageID.580-581.) Habeas corpus review does not involve re-weighing the evidence, re-evaluating the credibility of witnesses, or substituting this Court's judgment for that of the jury. *See Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009).

Here, the Michigan Court of Appeals articulated the appropriate standard under *Jackson v. Virginia* by citing state cases adopting this standard. The decision of the Michigan Court of Appeals finding that there was sufficient evidence to support the jury's verdict finding petitioner guilty of second-degree murder was not an unreasonable application of the *Jackson v. Virginia* standard. 28 U.S.C. § 2254(d)(1). As set out above, numerous prosecution witnesses testified that Petitioner possessed a gun and fired the first shot. Petitioner's argument depends entirely on re-weighing the credibility determination of the jury, which this Court is not permitted to undertake.

Furthermore, as regards Petitioner's argument concerning the lack of a ballistics match, Petitioner identifies no United States Supreme Court precedent requiring such a test in order to sustain his second degree murder and AWIM. The clearly established test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Here, overwhelming

evidence exists to sustain Petitioner's convictions, and accordingly I recommend Petitioner's first ground for habeas corpus relief be denied.

## II.     Prosecutorial Misconduct

In his second ground for habeas relief, Petitioner contends he was denied several constitutional rights, including due process, equal protection, and the right to a complete defense, when the prosecution failed to disclose the criminal history of Tawaun Toliver, one of its key witnesses.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.   The Supreme Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."   *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Exculpatory evidence includes evidence regarding the reliability of a witness." *Williams v. Coyle*, 260 F.3d 684, 706–07 (6th Cir. 2001) (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Carter v. Bell*, 218 F.3d 581, 602 (6th Cir. 2001). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 281 (quoting *Bagley,* 473

U.S. at 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

The Michigan Court of Appeals reviewed Petitioner's claim of prosecutorial misconduct under the *Brady* standards:

> Next, defendant argues that the prosecutor suppressed evidence of Toliver's criminal history in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). He argues that he was prejudiced by the prosecutor's suppression of this evidence because he was unable to effectively cross-examine Toliver with his prior convictions. Defendant did not raise a *Brady* violation at trial; thus, this unpreserved issue is reviewed is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).
>
>> To establish a *Brady* violation, a defendant must prove
>>
>> (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. [*People v Lester*, 232 Mich App 262, 281; 591 NW2d 267 (1998).]
>
> "Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule because, if disclosed and used effectively, such evidence may make the difference between conviction and acquittal." *Id.* at 280-281 (quotation omitted).
>
> Defendant's *Brady* claim fails because he fails to establish either that the prosecution had material impeachment evidence or that the prosecution suppressed this evidence. First, nothing in the record shows that the prosecutor possessed Toliver's criminal history. See *People v Cox*, 268 Mich App 440, 448-449; 709 NW2d 152 (2005) (holding that a defendant cannot prove a *Brady* violation where he does not establish that the prosecution withheld evidence). Second, assuming arguendo that the prosecution did have Toliver's criminal history, defendant does not

establish that Toliver could have been impeached by it because nothing in the record shows that Toliver had been convicted of a crime that involved an element of theft or dishonesty. See MRE 609(a). Consequently, defendant fails to establish a *Brady* violation, much less plain error affecting his substantial rights.

In a related argument, defendant asserts that the prosecutor had an affirmative duty to search the Law Enforcement Information Network (LEIN) and provide him with Toliver's criminal history. In support, he cites this Court's decision in *People v Mack*, 218 Mich App 359, 362-363; 554 NW2d 324 (1996). Defendant's citation to *Mack* is unavailing because our Supreme Court ruled that this Court's opinion in *Mack* "shall have no precedential force or effect." *People v Mack*, 455 Mich 865; 567 NW2d 251 (1997). Moreover, the prosecution does not have an affirmative duty to seek out and provide to a defendant LEIN information regarding the criminal histories of its witnesses. *People v Elkhoja*, 467 Mich 916; 658 NW2d 153 (2003) (adopting the dissenting opinion in *People v Elkhoja*, 251 Mich App 417, 452-453; 651 NW2d 408 (2002) (SAWYER, J., dissenting)).

Defendant also argues that the prosecutor committed misconduct by failing to disclose Toliver's criminal history and that the prosecutor's failure to disclose this information denied him his right to present a defense. As we have already noted, however, this argument is unfounded because there was no evidence that the prosecution possessed Toliver's criminal history in the first place. Moreover, a defendant is not denied his right to present a defense where the prosecution does not produce evidence that it had no duty to produce. *People v Anstey*, 476 Mich 436, 461-462; 719 NW2d 579 (2006).

(MCOA Op. 2-3, ECF No. 8-8, PageID.581-582.)

The court of appeals consideration of the *Brady* issue appears to be consistent with, and not contrary to, clearly established federal law. The prosecution disclosed Tawaun Toliver's immunity deal to the jury at trial. (Trial Tr. I, ECF No. 8-4, PageID.373.) Petitioner's counsel then thoroughly examined Petitioner's criminal history during cross examination, and elicited Tawaun's admission that he had a prior felony conviction for cocaine as well as "a couple other cases." (*Id.* at PageID.382.)

Under these circumstances, the Court concludes that there is no "reasonable probability" that disclosure of Tawaun Toliver's criminal history was exculpatory evidence that would have led to a different result.

Accordingly, the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, I recommend denial of relief on this claim.

## III.  Jury Instructions

In Ground III, Petitioner argues that the trial court violated his due process, equal protection, and other protected rights by overruling a defense objection to the flight instruction that was given to the jury by the trial court. He further argues that his double jeopardy rights were violated when the trial court overruled a defense objection to the jury verdict form that indicated Petitioner could be found guilty on either assault with intent to do great bodily harm less than murder or assault with intent to murder and felonious assault.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, the petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas

relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1077-78 (6th Cir. 2015).

The Michigan Court of Appeals rejected Petitioner's arguments regarding the flight instruction:

> Defendant first argues that the trial court abused its discretion by giving a flight instruction. "Jury instructions must clearly present the case and the applicable law to the jury." *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005). "The instructions must include all elements of the charged offenses and any material issues, defenses, and theories if supported by the evidence." *Id.* "Jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). Further, "[t]he defendant bears the burden of establishing that the asserted instructional error resulted in a miscarriage of justice." *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010).

> The prosecution introduced evidence that defendant left the scene of the shooting in a prompt fashion and that he later received medical treatment for a gunshot wound he suffered in the shooting. The prosecution also presented testimony that the car in which defendant was riding that evening was involved in an accident because it was traveling too fast for the snowy conditions. The trial court gave the jury the following instruction as it related to the evidence that defendant left the scene of the shooting:

>> There has been some evidence that the defendant tried to ran [sic] away, ran away, hid after the alleged crime. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake, or fear.

>> However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true and if true whether it shows that the defendant had a guilty state of mind.

> Defendant argues that the trial court abused its discretion by giving a flight instruction because the only inference that could be drawn from the

evidence is that he left the scene of the shooting because he sought medical treatment. We disagree.

Evidence of flight is admissible to support an inference of "consciousness of guilt." *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003). "The term 'flight' has been applied to such actions as fleeing the scene of the crime, leaving the jurisdiction, running from the police, resisting arrest, and attempting to escape custody." *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995). Although flight can indicate consciousness of guilt, "[f]light can result from factors other than guilt, and it is for the jury to determine what caused defendant to flee." *People v Taylor*, 195 Mich App 57, 63; 489 NW2d 99 (1992)

Here, the trial court did not abuse its discretion by instructing the jury that it could consider defendant's decision to leave the scene of the shooting as evidence of his consciousness of guilt, or as evidence that he left the scene for innocent reasons. Contrary to defendant's argument, the evidence produced at trial supported such an instruction. On the one hand, the evidence that defendant left the scene of the shooting in an abrupt manner, in a car traveling at a high rate of speed, and that that vehicle subsequently was involved in an accident because of that speed, could rationally support an inference that defendant left the scene of the crime because he was seeking medical treatment. On the other hand, the evidence also could rationally support the conclusion that defendant left the scene of the crime because he had a guilty conscience. Given the evidence, then, and the various ways it could be interpreted by the jury, the trial court's instruction was proper, see *Taylor*, 195 Mich App at 63-64, and defendant cannot satisfy his burden of demonstrating that the trial court's instructions did not present the issues to be tried in a fair manner, *Dupree*, 486 Mich at 702.

(MCOA Op. 3-4, ECF No. 8-8, PageID.582-583.)

I find that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court. Nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). As the Michigan Court of Appeals found, the evidence produced at trial court could rationally support an

inference by the jury that Petitioner left the scene because he had a guilty mind.  Both prosecution and defense witnesses testified that Petitioner left the scene soon after the shooting, and it was further produced at trial that the vehicle Petitioner was traveling in after the shooting was driving at a high rate of speed.  Thus Petitioner falls far short of demonstrating the flight instruction "so infected the entire trial" that his convictions violated due process.  *Henderson*, 431 U.S. 145, 154 (1977).

Petitioner's double jeopardy claim fares no better.  The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This clause provides three separate guarantees: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense. *See North United States v. Dixon*, 509 U.S. 688, 696 (1993); *Illinois v. Vitale*, 447 U.S. 410, 415 (1980); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

In this context, the United States Supreme Court has traditionally applied the "same-elements" test first enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  *See Rutledge v. United States*, 517 U.S. 292, 297 (1996).  The same-elements test, also known as the "*Blockburger* test," inquires whether each offense contains an element not contained in the other.  If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304.  If not,

they are the "same offense" and double jeopardy bars additional punishment. *See Brown v. Ohio*, 432 U.S. 161, 168-69 (1977). If the *Blockburger* test is satisfied, however, it is presumed that the legislature intended to punish the defendant under both statutes and there is no double jeopardy bar to multiple punishments. *Whalen v. United States*, 445 U.S. 684, 691-92 (1980).

The Michigan Court of Appeals found Petitioner was not subject to double jeopardy because the felonious assault charge required proof of an element that was not contained in the assault with intent to murder charge, namely that the assault occurred with a dangerous weapon. The court of appeals further found that the assault with intent to murder charge required a *mens rea* that the felonious assault charge did not:

> "The guarantee against double jeopardy protects against multiple prosecutions and multiple punishments for the 'same offense.'" *People v Denio*, 454 Mich 691, 706; 564 NW2d 13 (1997). The proper test for determining whether two offenses are the "same offense" such that double jeopardy is implicated is the *Blockburger* or "same elements" test. *People v Nutt*, 469 Mich 565, 576; 677 NW2d 1 (2004). The test "'focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" *Id.*, quoting *Iannelli v United States*, 420 US 770, 785 n 17; 95 S Ct 1284; 43 L Ed 2d 616 (1975).

> We conclude that the trial court's instructions were appropriate because double jeopardy was not implicated. First, the trial court instructed the jury that it was to consider Count II– AWIM and Count III–AGBH as alternatives, which the verdict form reflected. This was proper because AGBH is a necessarily lesser-included offense of AWIM, *People v Brown*, 267 Mich App 141, 150-151; 703 NW2d 230 (2005), and double jeopardy prohibits a defendant from being convicted of both a greater and necessarily lesser-included crimes for the same offense, see *Denio*, 469 Mich at 576. Second, the trial court permissibly instructed the jury

regarding felonious assault. Felonious assault requires proof of an element that is not present in AWIM or AGBH–primarily that the assault occurred with a dangerous weapon. *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).[2] And AWIM and AGBH both require an elevated *mens rea* that felonious assault does not require–that the defendant possessed an intent to kill for AWIM or an intent to inflict great bodily harm less than murder for AGBH. *Brown*, 267 Mich App at 147. Thus, being charged and convicted of felonious assault in conjunction with either AWIM or AGBH does not implicate double jeopardy, and the jury was properly instructed. Finally, we reject defendant's accompanying claim for ineffective assistance of counsel. Defendant's trial counsel objected to the instructions, and defendant cannot show that counsel was deficient because any additional objection would have been meritless. *Ericksen*, 288 Mich App at 201.

> [2] "The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *Avant*, 235 Mich App at 505.

(MCOA Op. 5, ECF No. 8-8, PageID.584) (footnote one omitted).

The Michigan Court of Appeals applied the *Blockburger* standard. Thus it cannot be said that the standard applied by the court of appeals was contrary to clearly established federal law. The court of appeals further found that each offense contained an element not found in the other. This appears to be an eminently reasonable finding. Moreover, it is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 at 68. Indeed, the decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

Accordingly, this ground for habeas relief should fail.

## IV.    Sentence Scoring

In his fourth and final ground for relief, Petitioner contends the trial court erred in two respects when scoring his offense variables.  Petitioner's challenge is non-cognizable on habeas review.

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Wilson*, 131 S. Ct. at 14; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 67-68; *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  Claims concerning the improper application of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings.  *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief).

Petitioner also fails to demonstrate a due process violation. A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980), *quoted in Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447;*United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner does not identify any facts found by the court at sentencing that were either materially false or based on false information. As regards offense variable five, Petitioner asserts that none of Marcus Jones' family members ever claimed they had suffered serious psychological injury requiring professional treatment. The court of appeals noted, however, that the pre-sentence investigation report contained information that Marcus Jones' children had nightmares after his death. The court of appeals found this sufficient evidence to support the scoring decision. That factual finding is presumed correct and Petitioner fails to overcome that presumption with clear and convincing evidence. He therefore fails to demonstrate that his sentence

violated due process. *Tucker*, 404 U.S. at 447; *United States v. Lanning*, 633 F.3d 469, 477 (6th Cir. 2011) (rejecting due process claim where the petitioner failed to point to specific inaccurate information relied upon by the court.

For all these reasons, I conclude the state-court's rejection of Petitioner's claims was not based on an unreasonable determination of the facts and was neither contrary to nor an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d).

## Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed

further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong. Accordingly, I recommend that a certificate of appealability should be denied.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated: August 3, 2017      /s/ Phillip J. Green
                                          PHILLIP J. GREEN
                                          United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).